ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
   – and –
BRIAN E. COCHRAN (286202)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DORA KLOBUS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) Case No.  3:24-cv-02534 |
| Plaintiff, | ) ) CLASS ACTION |
| vs. | ) ) COMPLAINT FOR VIOLATIONS OF THE ) FEDERAL SECURITIES LAWS |
| AKERO THERAPEUTICS, INC., ANDREW CHENG, WILLIAM WHITE, and CATRIONA YALE, | ) ) ) ) |
| Defendants. | ) ) DEMAND FOR JURY TRIAL |

Plaintiff Dora Klobus ("plaintiff"), individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings, public statements and press releases by Akero Therapeutics, Inc. ("Akero" or the "Company"), as well as media and analyst reports about Akero and the facts alleged herein.[1]  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Akero common stock between September 13, 2022 and October 9, 2023, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against Akero and certain of Akero's current senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because Akero conducts business and resides in this District, and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in and from this District.

---

[1]      Emphasis has been added unless otherwise noted.

4.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

5.    Plaintiff Dora Klobus, as set forth in the accompanying certification that is incorporated by reference herein, purchased and acquired Akero common stock during the Class Period and has been damaged thereby.

6.    Defendant Akero is a Delaware corporation with its principal executive offices located in South San Francisco, California.  Akero common stock is listed and publicly traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "AKRO."  Akero is a clinical stage biopharmaceutical company that was founded to develop transformational medicines for patients with serious metabolic diseases that lack effective treatment options.  The Company is currently focused on advancing its lead product candidate efruxifermin ("EFX"), formerly known as AKR-001, to provide a new treatment for patients with nonalcoholic steatohepatitis, a serious liver disease.

7.    Defendant Andrew Cheng, M.D. ("Cheng") has served as Akero's President and Chief Executive Officer ("CEO") and a member of Akero's Board of Directors since September 2018.

8.    Defendant William White ("White") has served as Akero's Chief Financial Officer since May 2019.

9.    Defendant Catriona Yale ("Yale") has served as Akero's Chief Development Officer since 2018.

10.    Defendants referenced in ¶¶7-9 above are referred to herein as the "Individual Defendants."  The Individual Defendants and Akero are referred to herein as "defendants."

11.    Each of the Individual Defendants was directly involved in the management and day-to-day operations of Akero at the highest levels and was privy to confidential proprietary information concerning Akero and its business, operations, securities offerings, clinical trials, plans, and present and future business prospects.  In addition, the Individual Defendants were involved in

1  drafting, producing, reviewing, and/or disseminating the false and misleading statements and

2  information alleged herein, and were aware of, or recklessly disregarded, the false and misleading

3  statements being issued about Akero and its clinical trials of EFX, and approved or ratified these

4  statements, in violation of the federal securities laws.

5        12.    As officers and controlling persons of a publicly held company whose securities are

6  registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is

7  governed by the provisions of the federal securities laws, the Individual Defendants each had a duty

8  to promptly disseminate accurate, truthful, and complete information with respect to Akero's

9  operations, business, expenditures, and present and future business prospects, including information

10  concerning Akero's clinical trials of EFX. Defendants' false and misleading misrepresentations and

11  omissions during the Class Period violated these specific requirements and obligations.

12        13.    The Individual Defendants, because of their positions of control and authority as

13  officers and/or directors of Akero, were able to, and did, control the contents of various SEC filings,

14  press releases, and other public statements pertaining to Akero and its clinical trials of EFX. Each

15  Individual Defendant was provided with copies of the documents alleged herein to be false and

16  misleading before or shortly after their issuance, participated in conference calls with investors

17  during which false and misleading statements were made, and had the ability and opportunity to

18  prevent the statements' issuance or cause them to be corrected. Accordingly, each Individual

19  Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore,

20  primarily liable for the representations contained therein.

21                                          **BACKGROUND**

22  **Nonalcoholic Steatohepatitis**

23        14.    Nonalcoholic steatohepatitis ("NASH") is a serious form of nonalcoholic fatty

24  disease ("NAFLD") that is estimated to affect 17 million Americans. According to Akero, NASH is

25  primarily driven by chronic excess caloric intake, or ingesting more energy than the body expends

26  over a sustained period, which results in people becoming overweight and obese. NASH is

27  characterized by an excessive accumulation of fat in the liver that causes stress and injury to liver

28  cells, leading to inflammation and fibrosis (scarring) that can progress to cirrhosis, liver failure,

cancer, and death.  Approximately 20% of NASH patients will progress to cirrhosis, which has a higher risk of mortality.  During the relevant period, no drugs had been approved by the U.S. Food and Drug Administration ("FDA") for the treatment of NASH, representing a critical unmet need in the field of liver disease.

**Efruxifermin (EFX)**

15.  Akero's lead product candidate, EFX, is a protein that was engineered to mimic the effect of fibroblast growth factor 21 ("FGF21"), a naturally occurring human hormone that protects against cellular stress and regulates whole-body metabolism and tissue-specific stress responses.  Akero asserts that "[b]y delivering sustained and balanced signaling through FGF21's receptors in liver and adipose tissue, EFX has the potential to treat NASH by addressing all core drivers of disease progression."  EFX was designed to be administered to patients once weekly via subcutaneous injections.

**Akero's Clinical Trials Testing EFX in the Treatment of Cirrhotic and Pre-Cirrhotic NASH**

16.  Over the past several years, Akero has designed and overseen a series of clinical trials to test the efficacy and safety of EFX in treating NASH patients.  Akero differentiated its trials, in part, by testing EFX in different NASH populations.  Some trials targeted NASH patients with more severe symptoms (*i.e.*, those with NASH-induced cirrhosis), while other trials targeted NASH patients with less severe symptoms (*i.e.*, those who were pre-cirrhotic).  Akero's cirrhotic versus pre-cirrhotic dividing line comports with FDA guidance published in 2018 and 2019 that considers pre-cirrhotic NASH and cirrhotic NASH as two separate indications for treatment purposes.

17.  Thus, relevant to determining whether a patient was eligible to participate in a particular study (or cohort of a study), Akero first needed to confirm that the patient suffered from NASH and next needed to determine whether the patient was pre-cirrhotic or suffering from NASH-induced cirrhosis.

18.  The most reliable diagnosis and staging of NASH is achieved by examining a liver biopsy specimen under a microscope.  A liver biopsy, however, is an invasive procedure involving

the extraction of a liver tissue sample.  Further complicating matters, liver biopsies have been associated with occasionally causing morbidity (the state of being unhealthy for a particular disease) and, in rare circumstances, mortality.  As a result, the use of liver biopsies in clinical trials poses significant logistical challenges (including cost and the availability of pathologists with specific expertise in NASH); and many patients are reluctant or unwilling to undergo the procedure given its invasive nature and attendant risks – concerns that the COVID-19 pandemic only exacerbated.

19.     Non-invasive biomarkers are sometimes used to diagnose or assess the various grades of NASH and stages of liver fibrosis.  For example, a liver elastography through a FibroScan, a special ultrasound technology that measures liver stiffness (hardness) and fat changes in the liver, is sometimes used in conjunction with the following scale:

- A fibrosis score of F0 to F1 (2 to 7 [kilopascals ("kPa")]) means there is little or no scarring on the liver.

- A fibrosis score of F2 (7.5 to 10 kPa) indicates moderate scarring that has spread outside the liver.

- A fibrosis score of F3 (10 to 14 kPa) indicates severe scarring which has spread and disrupts normal blood flow.

- A fibrosis score of F4 (14 kPa or higher) means late-stage scarring or cirrhosis, where the scarring is permanent and the damage is irreversible.

20.     During the Class Period, Akero claimed to be evaluating EFX in two Phase 2 clinical trials in patients with **biopsy-confirmed NASH**:  (i) Akero's "HARMONY" trial that tested EFX in **pre-cirrhotic NASH patients**; and (ii) Akero's "SYMMETRY" trial that purportedly tested EFX in **patients with NASH-induced cirrhosis**.[2]

21.     The HARMONY trial was officially titled "A Phase 2b, Randomized, Double-Blind, Placebo Controlled Study Evaluating the Safety and Efficacy of Efruxifermin **in _Non-Cirrhotic_**

---

[2]      Potential new treatments go through several phases of drug trials before they can be approved by the FDA.  Each phase has a different purpose.  Phase 1 trials test a drug in a small group of people (usually 15-50 patients) for safety and to identify side effects.  Phase 2 trials test a drug in a larger group of people (usually fewer than 100 patients) to confirm the drug's effectiveness and further study its safety.  Phase 3 trials test a drug in a larger group of people (usually hundreds or thousands of patients) to confirm the drug's effectiveness, monitor side effects, compare it with standard or similar treatments (if applicable), and collect information that will allow the new drug to be used safely.

*Subjects With Nonalcoholic Steatohepatitis (NASH)*."  The 96-week Phase 2b HARMONY study was a multicenter, randomized, double-blind, placebo-controlled clinical trial that enrolled 128 biopsy-confirmed NASH patients with fibrosis stage 2 or 3 (F2 or F3) who each received once-weekly subcutaneous dosing of 28 milligrams of EFX, 50 milligrams of EFX, or a placebo.  On the first day of the Class Period, Akero published a readout of data collected through week 24 of the study.  Thereafter, HARMONY trial patients continued to receive EFX or placebo for up to 96 weeks to provide additional data.

22.    The SYMMETRY study was officially titled "A Phase 2b, Randomized, Double-Blind, Placebo-Controlled Study Evaluating the Safety and Efficacy of Efruxifermin in *Subjects With Compensated Cirrhosis Due to Nonalcoholic Steatohepatitis (NASH)*."[3]  Akero claimed that the 96-week SYMMETRY study was a multicenter, randomized, double-blind, placebo-controlled clinical trial that enrolled 182 patients *with biopsy-confirmed compensated cirrhosis (F4), Child-Pugh class A, due to NASH*, each of whom received once-weekly subcutaneous injections of 28 milligrams of EFX, 50 milligrams of EFX, or placebo.[4]  The day after the Class Period ended, Akero published a readout of data collected through week 36 of the trial (based on a second liver biopsy).  SYMMETRY trial patients continue to receive EFX or placebo for up to 96 weeks to provide additional data, including through a second on-treatment biopsy (third overall) at week 96.

---

[3]    Cirrhosis has two different clinical stages: compensated and decompensated.  Compensated cirrhosis is the asymptomatic stage and corresponds to Child-Pugh score A (a scoring system used to determine the degree of liver failure present in patients with cirrhosis).  Decompensated cirrhosis is the symptomatic stage that is characterized by the presence or development of overt complications such as ascites, jaundice, variceal hemorrhage, or hepatic encephalopathy and corresponds to Child-Pugh score B (moderate) or C (severe).  For compensated cirrhosis patients, non-invasive parameters may all be normal and therefore a liver biopsy is required for the most accurate diagnosis.  In clinical practice, however, few patients are given a biopsy with clinicians instead using blood tests and abdominal ultrasonography.

[4]    The SYMMETRY study added a separate expansion cohort, known as Cohort D, which evaluated the safety and tolerability of EFX compared to placebo when added to an existing GLP-1 receptor agonist in patients with pre-cirrhotic NASH (F1-F3 fibrosis) and Type 2 diabetes ("Cohort D").  Unless indicated otherwise, references to the SYMMETRY study herein are to the main SYMMETRY study and not to Cohort D.

**Defendants' Fraudulent Scheme**

23.    Akero is a clinical stage drug development company with a limited operating history. The Company has yet to generate any revenues because the FDA has not approved any of its drug candidates for sale.  Because funding drug development, clinical trials, and commercialization is capital-intensive, Akero has suffered significant recurring losses since its inception, including over $290 million in losses during the years 2020 to 2022 alone.  To finance the Company's operations, Akero conducted two secondary stock offerings and one at-the-market stock offering during the Class Period, raising over $577 million.

24.    In order to successfully complete these offerings and raise part of the funding Akero needed to develop and commercialize EFX, defendants repeatedly misled investors as to the true nature of the patient population that was being tested in Akero's SYMMETRY study.  Specifically, despite telling investors that the study's patient population was limited to those with NASH-induced cirrhosis (a fact that was key for data integrity and the likelihood of study success), *for approximately 20% of those being tested Akero had not confirmed that the patients had NASH and that NASH had in fact caused their cirrhosis*.

25.    Significantly, cirrhosis has multiple etiologies.  Cirrhosis can be caused by alcohol abuse, hepatitis, and NAFLD (including its NASH subtype), among other causes.  When the cause of a patient's cirrhosis is unknown, however, it is referred to as "cryptogenic" cirrhosis – *i.e.*, cirrhosis "of obscure or unknown origin."  Unbeknownst to investors, approximately 20% of the patients in the SYMMETRY study had cryptogenic cirrhosis.

26.    Cryptogenic cirrhosis is treated differently from NASH cirrhosis by medical experts.  For example, in an article titled "Is cryptogenic cirrhosis different from NASH cirrhosis?" written by Paul J. Thuluvath, Sergey Kantsevoy, Avesh J. Thuluvath, and Yulia Savva, the authors concluded that "[b]ased on risk perspectives, [cryptogenic cirrhosis] should not be equated with the term 'NASH cirrhosis'."  Their conclusion was based on a comparison of the clinical characteristics of thousands of adults with cryptogenic cirrhosis (n=7,999) to those with cirrhosis caused by NASH (n=11,302), alcohol (n=21,714), and autoimmune hepatitis (n=3,447).  As further explained: "We hypothesized that cryptogenic cirrhosis is a distinct condition from cirrhosis caused by [NASH]. By

comparing cryptogenic cirrhosis with cirrhosis of other causes, we found clear clinical differences. Therefore, cryptogenic cirrhosis should not be considered the same as NASH cirrhosis."

27.     In the FDA's 2019 draft guidance for industry titled "Nonalcoholic Steatohepatitis with Compensated Cirrhosis: Developing Drugs for Treatment," the FDA cautioned sponsors of drugs designed to treat compensated NASH cirrhosis against including cryptogenic cirrhosis patients in trials.  The draft guidance stated:

> Sponsors should be careful to enroll in clinical trials only patients whose cirrhosis is secondary to NASH and not caused by other etiologies.  Patients should have histological diagnoses of NASH, and other causes of chronic liver disease should be ruled out (e.g., alcoholic liver disease, viral hepatitis, primary biliary cholangitis, primary sclerosing cholangitis, autoimmune hepatitis, Wilson's disease, hemochromatosis, alpha-1-antitrypsin deficiency, HIV).

28.     The distinction between NASH-induced cirrhosis and cryptogenic cirrhosis comes with an important difference.  Patients suffering from cryptogenic cirrhosis often have a more advanced (severe) form of cirrhosis and therefore have a different risk profile.  Additionally, EFX's mechanism of action may not work in patients whose cirrhosis was caused by something other than NASH.  The inclusion of cryptogenic cirrhotics in the SYMMETRY study therefore introduced a risk of negatively impacting or confounding the trial's results – risks that were concealed from investors during the Class Period.

29.     Defendants' Class Period representations gave the impression that cryptogenic cirrhotics were excluded from the SYMMETRY study.  First, defendants represented that enrolled patients had biopsy-confirmed NASH-induced cirrhosis and made no mention of cryptogenic cirrhotics.   Indeed, the study itself was titled "***A Study of Efruxifermin in Subjects With Compensated Cirrhosis <u>Due to Nonalcoholic Steatohepatitis (NASH)</u>***."

30.     Second, in March 2021 (before the Class Period), Akero reported results for a similar clinical trial in which the Company tested EFX in patients with cirrhotic NASH (the Cohort C Expansion of Akero's Phase 2a "BALANCED" study).  Akero's reported results did not include ***any*** mention of patients with cryptogenic cirrhosis.

31.     Third, in describing the SYMMETRY study and its endpoints, Akero never disclosed during the Class Period that the Company intended to exclude the results of cryptogenic cirrhotics "who didn't meet definitive NASH at baseline" when calculating the study's secondary endpoints for NASH resolution.[5]

32.     Fourth, when Akero finally did report the SYMMETRY study's initial results, analysts recognized the inclusion of cryptogenic cirrhotics as important new information, asking questions about their inclusion, and then questioning – based on this new information – whether the inclusion of these patients negatively impacted the trial's design and results.

33.     Instead of being forthright with investors about the inclusion of cryptogenic cirrhotics in the SYMMETRY study, defendants hid this information, which prevented investors from accurately pricing the risk that the study would fail to meet its primary endpoint as a result of this concealed fact.  It was not until the Company disclosed the study's 36-week results on October 10, 2023 that the market finally began to learn the truth, with investors suffering substantial losses and damages under the federal securities laws as the price of Akero stock plummeted nearly ***70%*** in response.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD**

34.     The Class Period begins on September 13, 2022.  On that date, Akero filed with the SEC a Form 8-K signed by defendant Cheng (the "September 13, 2022 Form 8-K").  The September 13, 2022 Form 8-K reported the 24-week results for Akero's Phase 2b HARMONY study of EFX in patients with pre-cirrhotic NASH.  The September 13, 2022 Form 8-K and the attached press release stated that both the 50 milligram and 28 milligram doses of EFX had achieved statistical significance on primary and secondary histology endpoints after 24 weeks.

35.     The September 13, 2022 Form 8-K and the attached press release also discussed Akero's SYMMETRY study, describing it as "***a Phase 2b trial in <u>biopsy-confirmed NASH patients</u>***

---

[5]     A clinical study may have one or more primary and secondary endpoints.  Primary endpoints serve as the basis for determining whether the study met its objective.  Secondary endpoints can provide additional support for approval of a drug by the FDA.

1  ***with compensated cirrhosis, Child-Pugh class A***" and "***the SYMMETRY study in*** ___patients with___

2  ___cirrhotic NASH (F4 fibrosis, compensated)___."

3      36.    On that same day, defendants held an investor call to discuss the results from the

4  HARMONY study (the "September 13, 2022 Call").   During the September 13, 2022 Call,

5  defendants Cheng and Yale both described the SYMMETRY study as "***our ongoing Phase 2b***

6  ***SYMMETRY study in*** ___patients with cirrhotic NASH___."   Defendant Yale further stated in pertinent

7  part:

8           ***On the more immediate horizon, we are encouraged by the strength of our***
        ***histology results and what they mean for our ongoing Phase 2b SYMMETRY study***
9       ***in*** ___patients with cirrhotic NASH___***.   Based on today's results, we believe EFX has the***
        ***potential to be the first investigational NASH drug to achieve statistically***
10      ***significant histological improvement in*** ___patients with cirrhotic NASH___.

11     37.    Two days later, on September 15, 2022, Akero filed with the SEC a prospectus

12 supplement (to a prospectus previously filed on May 18, 2021) for a secondary offering of Akero

13 common stock (the "September 2022 Prospectus").   Pursuant to the September 2022 Prospectus, the

14 Company eventually sold over 8.8 million shares of Akero common stock at $26 per share, raising

15 gross proceeds of approximately $230 million.

16     38.    The September 2022 Prospectus reiterated that the SYMMETRY study was being

17 conducted in patients with NASH-induced cirrhosis, stating in relevant part as follows:

18          We are a clinical-stage company dedicated to developing transformational
19      treatments for patients with serious metabolic diseases marked by high unmet
        medical need, including non-alcoholic steatohepatitis, or NASH, a disease without
20      any approved therapies.   NASH is a severe form of nonalcoholic fatty liver disease,
        or NAFLD, characterized by inflammation and fibrosis in the liver that can progress
21      to cirrhosis, liver failure, cancer and death.   Our lead product candidate,
        efruxifermin, or EFX, is an analog of fibroblast growth factor 21, or FGF21, which is
22      an endogenously expressed hormone that protects against cellular stress and regulates
        metabolism of lipids, carbohydrates and proteins throughout the body.   ***EFX is***
23      ***currently being evaluated in two Phase 2b clinical trials in patients with biopsy-***
        ***confirmed NASH:*** the HARMONY study in patients with pre-cirrhotic NASH (F2-
24      F3 fibrosis) and ***the SYMMETRY study in*** ___patients with cirrhotic NASH (F4___
        ___fibrosis, compensated)___.

25     39.    The September 2022 Prospectus, in a section titled "Our pipeline," reiterated that the

26 SYMMETRY study was evaluating EFX in patients with NASH-induced cirrhosis, stating in

27 pertinent part as follows:

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                           - 10 -

Our pipeline is anchored by EFX, a potential best-in-class FGF21 analog for treatment of NASH, if approved.  We have one EFX program focused on patients with pre-cirrhotic NASH (F2-F3), which is supported by the HARMONY study, an ongoing Phase 2b clinical trial.  ***We have a second EFX program focused on patients with cirrhotic NASH (F4, compensated), which is supported by the SYMMETRY study, an ongoing Phase 2b clinical trial.  These two programs align with FDA guidance published in 2018 and 2019, which recommends different regulatory approval pathways for patients with pre-cirrhotic and cirrhotic NASH***.

40.     On November 4, 2022, Akero filed with the SEC a Form 10-Q signed by defendants Cheng and White (the "3Q22 10-Q").  The 3Q22 10-Q reported the Company's financial results for the third quarter of 2022 ending September 30, 2022.  The 3Q22 10-Q described the SYMMETRY study in pertinent part as follows: "***[O]ur ongoing Phase 2b clinical trial of EFX in underlined patients with NASH who have cirrhosis (F4 fibrosis, compensated), known as the SYMMETRY study***."

41.     The 3Q22 10-Q further stated in relevant part as follows: "***EFX is currently being evaluated in two Phase 2b clinical trials in patients with biopsy-confirmed NASH***: the HARMONY study in patients with pre-cirrhotic NASH (F2-F3 fibrosis) and the ***SYMMETRY study in patients with cirrhotic NASH (F4 fibrosis, compensated)***."

42.     Two months later, on January 10, 2023, defendant Cheng delivered a presentation at a JPMorgan Healthcare Conference during which Cheng discussed the SYMMETRY study in relevant part as follows:

> ***[B]ut really the biggest readout this year is in the F4 population.  And for us, that's in the fourth quarter with SYMMETRY, with the patients with compensated cirrhotics***.  And people, I often get a question is why do we think this is going to be successful?  I think the short answer is that we have proof-of-concept data, where we saw 58% of patients in a very, very small proof-of-concept study demonstrated either 1-stage improvement of fibrosis or NASH resolution after just 16 weeks of dosing.  And I'll talk about that momentarily.  I do want to remind everyone, this may look similar, but this is – like HARMONY, it's a randomized, double-blind, placebo-controlled trial.  ***SYMMETRY only [involves] patients with biopsy-proven NASH, F4.  And the primary endpoint of cirrhosis reversal, that is 1-stage improvement in cirrhosis.  The similar secondary markers are being filed in the secondary endpoint, fibrosis markers and other liver injury markers.  But the biggest difference is the duration***.  It's not a 24-week study, but a 36-week one.

43.     On March 17, 2023, Akero filed with the SEC its Form 10-K Annual Report for the year ending December 31, 2022 signed by defendants Cheng and White (the "2022 10-K").  The 2022 10-K described the SYMMETRY study in pertinent part as follows: "***[O]ur ongoing Phase 2b***

1   *clinical trial of EFX in <u>patients with NASH who have cirrhosis</u> (F4 fibrosis, compensated), known*

2   *as the SYMMETRY study.*"

3        44.    The 2022 10-K further stated in pertinent part as follows:

4             **EFX is currently being evaluated in two Phase 2b clinical trials in patients with <u>biopsy-confirmed NASH</u>:** a long-term follow-up period for the HARMONY

5   study in patients with pre-cirrhotic NASH (F2-F3 fibrosis), for which we have reported results after 24 weeks of treatment, and the **SYMMETRY study in patients**

6   **with <u>cirrhotic NASH</u> (F4 fibrosis, compensated)**.

7        45.    The 2022 10-K further stated in a section titled "Our Pipeline" that the study was

8   focused on "patients with cirrhotic NASH," stating in relevant part as follows:

9             Our pipeline is anchored by EFX, a potential best-in-class FGF21 analog for treatment of NASH, if approved.  We have one EFX program focused on patients

10   with pre-cirrhotic NASH (F2-F3), which is supported by the HARMONY study, an ongoing Phase 2b clinical trial.  **We have a second EFX program focused on**

11   **<u>patients with cirrhotic NASH</u> (F4, compensated), which is supported by the SYMMETRY study, an ongoing Phase 2b clinical trial.  These two programs align**

12   **with FDA guidance published in 2018 and 2019, which recommends different regulatory approval pathways for patients with pre-cirrhotic and cirrhotic NASH**.

13

14        46.    In providing an "Overview of EFX Clinical Development" the 2022 10-K reiterated

15   that the SYMMETRY study was limited to patients with cirrhotic NASH, stating in relevant part

16   that: "**We have two active EFX programs supported by two ongoing, parallel Phase 2b clinical**

17   **trials**: the HARMONY study in pre-cirrhotic patients with F2-F3 fibrosis and **the SYMMETRY**

18   **study in <u>patients with cirrhosis due to NASH</u> (F4, compensated)**."

19        47.    The 2022 10-K further described the "**Phase 2b clinical trial of EFX in <u>patients with</u>**

20   **<u>biopsy-confirmed cirrhotic NASH</u>** (F4, compensated) for 36 weeks" as follows, stating in pertinent

21   part: "**The Phase 2b SYMMETRY main study is a multicenter, randomized, double-blind, placebo-**

22   **controlled, clinical trial in <u>biopsy-confirmed NASH patients with compensated cirrhosis</u> (F4,**

23   **Child-Pugh class A)**."

24        48.    Also on March 17, 2023, Akero filed with the SEC a prospectus supplement (to a

25   prospectus originally filed May 18, 2021) in connection with an at-the-market stock offering that

26   ultimately raised at least $127 million in gross proceeds (the "March 2023 ATM Prospectus").  The

27

28

1   March 2023 ATM Prospectus incorporated the 2022 10-K by reference and therefore repeated and

2   reissued the false and misleading statements and omissions contained in the 2022 10-K.

3       49.    On May 15, 2023, Akero filed with the SEC a Form 8-K, signed by defendant Cheng,

4   that reported Akero's financial results for the first quarter of 2023 and provided a business update in

5   a press release attached as an exhibit (the "May 15, 2023 Form 8-K").  The May 15, 2023 Form 8-K

6   stated: "***Results from the Phase 2b SYMMETRY study, evaluating treatment of <u>patients with</u>***

7   ***<u>compensated cirrhosis due to NASH</u>, on track to be reported in the fourth quarter of this year***."

8       50.    On May 17, 2023, Akero filed with the SEC a prospectus supplement (to a prospectus

9   originally filed May 18, 2021) in connection with a secondary offering of common stock that

10  ultimately sold over 5.2 million shares at $42 per share and raised $220 million in gross proceeds

11  (the "May 2023 Prospectus").  The May 2023 Prospectus incorporated the 2022 10-K by reference

12  and therefore repeated and reissued the false and misleading statements and omissions contained in

13  the 2022 10-K.

14      51.    On September 12, 2023, at a Morgan Stanley Global Healthcare Conference,

15  defendant Cheng described the SYMMETRY trial in an investor presentation while again omitting

16  information concerning the inclusion of cryptogenic cirrhotics among the study's patient population,

17  stating in relevant part:

18      ***So this trial is a very straightforward Phase IIb trial***.  It's 182 patients, randomized
    1:1:1 to placebo 28 milligrams, of efruxifermin of 50 milligrams.  ***These are patients***
19      ***with biopsy-confirmed NASH.  That is that they have F4 NASH, they're cirrhotic***
    ***and they're Child-Pugh Class A.  These patients, also known as compensated***
20      ***cirrhotics***, they're dosed for 36 weeks.  And the primary endpoint is one stage
    improvement in fibrosis without worsening of NASH.  ***And we're also looking at***
21      ***key secondary endpoints such as NASH resolution and a number of other***
    ***biomarkers***.
22

23      52.    The statements referenced in ¶¶34-51 above were materially false and misleading

24  when made because they failed to disclose the following adverse facts pertaining to Akero's

    business, operations, and financial condition, which were known to or recklessly disregarded by
25
    defendants as follows:
26

27      (a)    that approximately 20% of the patients enrolled in the SYMMETRY study

28  had cryptogenic cirrhosis and did not have definitive NASH at baseline (an NAFLD activity score of

1  greater than or equal to 3, with a score of at least 1 in each of the components of steatosis,

2  ballooning, and inflammation);

3    (b) that the cryptogenic cirrhotic patients included in the SYMMETRY study did

4  not have biopsy-proven compensated cirrhosis due to definitive NASH;

5    (c) that the results from the cryptogenic cirrhosis patients – *i.e.*, those who did not

6  have definitive NASH – were to be excluded from the calculation of the NASH resolution secondary

7  endpoints;

8    (d) that, as a result of the inclusion of cryptogenic cirrhotics in the SYMMETRY

9  study and in the calculation of the study's primary endpoint, Akero had introduced a confounding

10  factor into the study's design, materially influencing the study's potential results and increasing the

11  risks that the study would fail to meet its primary endpoint;

12    (e) that the SYMMETRY study did not align with FDA guidance for testing a

13  drug in treating NASH cirrhotics because Akero had not ruled out potential causes of each patient's

14  cirrhosis other than NASH; and

15    (f) that, as a result of (a)-(e) above, defendants had materially misrepresented the

16  nature of the SYMMETRY trial, its usefulness in supporting any new drug application filed by

17  Akero in supporting approval for cirrhotic NASH patients, the likelihood that the SYMMETRY trial

18  would be successful as measured by its primary endpoint, and the likelihood that EFX would

19  become a commercial treatment for NASH cirrhotics.

20    53. Before the market opened on October 10, 2023, Akero filed with the SEC a Form 8-

21  K, signed by defendant Cheng, that attached a related press release and slide presentation as exhibits,

22  in which the Company announced the results of the Phase 2b SYMMETRY trial (the "October 10,

23  2023 Form 8-K").  The trial's primary efficacy endpoint was the proportion of patients who achieved

24  ≥1 stage improvement in fibrosis and no worsening of NASH, based on liver biopsies collected at

25  week 36 versus baseline.  The press release attached to the October 10, 2023 Form 8-K attempted to

26  gloss over the fact that the SYMMETRY study had failed to meet its primary endpoint (as the results

27  were not statistically significant) by calling the results a "trend" instead.  The October 10, 2023

28  Form 8-K stated in relevant part:

Akero Therapeutics, Inc., a clinical-stage company developing transformational treatments for patients with serious metabolic disease marked by high unmet medical need, today reported a 36-week analysis of SYMMETRY, a 96-week Phase 2b study evaluating the efficacy and safety of its lead product candidate efruxifermin (EFX) in patients with compensated cirrhosis (F4) due to nonalcoholic steatohepatitis (NASH).

***A trend was observed for the primary endpoint of fibrosis improvement at 36 weeks, with 22% and 24% of the 28mg and 50mg EFX-treated groups, respectively, experiencing at least a one-stage improvement in liver fibrosis and no worsening of NASH, compared with 14% for placebo***.  In addition, 4% of patients in each of the EFX-treated groups experienced a three- or two-stage fibrosis improvement without worsening of NASH – from compensated cirrhosis (F4) to F1 or F2, compared with 0% for placebo.

54.     The October 10, 2023 Form 8-K further attempted to minimize the impact of the study's disappointing primary endpoint results by highlighting the statistically significant results in certain of the trial's secondary endpoints, most importantly NASH resolution, stating in pertinent part as follows:

Statistically significant rates of NASH resolution in 63% and 60% of patients at week 36 were observed for the 28mg and 50mg EFX-treated groups, respectively, compared with 26% for placebo, representing the highest response rates reported to date for NASH resolution in this patient population.  Statistically significant improvements were also observed for both EFX groups in non-invasive markers of liver injury and fibrosis, insulin sensitization and lipoproteins.

55.     Tellingly, when calculating the placebo arm for the primary endpoint, defendants listed 57 patients as being in the placebo arm's data set, whereas when defendants calculated the number of patients in the placebo arm of the secondary endpoints for NASH resolution, defendants only listed 46 patients as being in the placebo arm.  This 11-patient discrepancy in the placebo arm stems from Akero's exclusion of cryptogenic patients when calculating NASH resolution, as reflected in footnote 1 of the press release, which notes in relevant part: "Source Data: Liver Biopsy Analysis Set (fibrosis improvement); ***Liver Biopsy Analysis Set (definitive NASH only) (resolution of NASH*** and combined endpoint)."  The slideshow attached to the October 10, 2023 Form 8-K further explained that "*[a]ll patients had* biopsy-proven compensated cirrhosis (fibrosis stage 4) due to definitive NASH ***or cryptogenic cirrhosis presumed secondary to NASH.  Subjects with cryptogenic cirrhosis were limited to approximately 20% of the total study population*."

56.     Also that morning, Akero held a call with investors to discuss the SYMMETRY trial's results (the "October 10, 2023 Call") led by the Individual Defendants.  During the October

10, 2023 Call, defendants confirmed what they previously concealed from investors regarding the

makeup of the patient population in the SYMMETRY trial.  In her prepared remarks, defendant Yale

explained the discrepancy in pertinent part as follows:

> [G]ood morning, everybody.  I'd like to begin with a review of the design of the SYMMETRY study, which is shown on Slide 6.
>
> The SYMMETRY study is a Phase IIb randomized, double-blind, placebo-controlled multicenter dose-ranging trial.  ***All patients had biopsy-proven compensated cirrhosis fibrosis Stage 4 due to definitive NASH <u>or cryptogenic cirrhosis, presumed secondary to NASH</u>.***
>
> ***Subjects with cryptogenic cirrhosis were limited to approximately 20% of the total study population***.
>
> *       *       *
>
> ***This study enrolled patients with advanced liver disease, including <u>patients with either cryptogenic cirrhosis</u> or definitive NASH.  The analysis set for NASH resolution endpoints <u>excluded those with cryptogenic cirrhosis who didn't meet definitive NASH at baseline</u>.  That is the NAFLD activity score of greater than equal to 3, with a score of at least 1 in each of the components of steatosis, ballooning and inflammation.***
>
> ***Consequently, the analysis set for NASH resolution is comprised of 126 patients, with 46, 38 and 42 patients, respectively, in the placebo, 28 milligram, and 50 milligram dose groups.***
>
> ***Cryptogenic cirrhosis is sometimes referred to as burn-type NASH, and is associated with advanced fibrosis and a higher level of risk in terms of liver decompensation or death***.

57.    During the Question-and-Answer session of the October 10, 2023 Call, analysts

pressed the Company on the inclusion of cryptogenic cirrhotics in the study, recognizing that the

information was new and that the inclusion of these patients was a confounding factor in the results.

For example, J.P. Morgan analyst Eric Joseph asked:

> And then, this potential for cryptogenic NASH, I think, is a new variable in thinking about the context of an F4 study.  I guess, what's sort of – to the extent there are – any measures that could be tak[en] in a Phase III program to sort of reduce their participation and perhaps get a clearer signal?

58.    Defendant Cheng replied by acknowledging the different risk profile for cryptogenic

cirrhotics, stating:

> In terms of cryptogenic cirrhosis, I think these patients represent a part of the cirrhotic spectrum.  And they have a little more advanced NASH, and I think we've – and in consultation with the FDA, have chosen to limit the patients to about 20% of

the population.  And I think that's something we may consider to do.  But of course, that's pending discussions with the agency, which we haven't had.

59.     Defendant Yale thereafter admitted, in response to further analyst questions, that exclusion of the cryptogenic cirrhotics from the secondary endpoint calculations had been pre-specified in the trial's protocol, thus confirming defendants' knowledge or reckless disregard of the true facts concerning the SYMMETRY study's patient population despite the fact that this information was contrary to what defendants had told investors regarding the trial's design.

60.     In response to this news, the price of Akero stock closed down $30.39 per share on October 10, 2023 and $3.11 per share on October 11, 2023 on higher than average volume – a decline of **nearly 70%** from the stock's closing price of $48.54 per share on October 9, 2023.

61.     In the days that immediately followed, analysts cut their price targets on Akero stock, with Morgan Stanley cutting its price target from $70 per share to $33 per share, Cantor Fitzgerald cutting its price target from $69 per share to $39 per share, H.C. Wainwright & Co. cutting its price target from $64 per share to $40 per share, and UBS cutting its price target from $83 per share to $39 per share.

62.     Multiple analysts took particular issue with the previously undisclosed inclusion of cryptogenic cirrhotics in the trial.  Cantor Fitzgerald, for instance, noted in an October 10, 2023 research report that the inclusion of cryptogenic cirrhotics "**was a surprise to us and most investors**," that "[t]hese patients were included in the primary endpoint but excluded from NASH resolution as they don't have definitive NASH," and that "[t]reatment effect for EFX is a little worse in cryptogenic NASH relative to definitive NASH, which we think **may have negatively affected trial results as a few percentage points of efficacy benefit in EFX favor would have led to statistical significance**."

63.     Similarly, H.C. Wainwright & Co.'s October 11, 2023 research report stated in relevant part:

> **Here's what we disliked or confused us about SYMMETRY**.  Why cryptogenic cirrhotics?  Why did the study entry criteria not exclude anyone but definitive NASH cirrhotics (NAS $\geq$ 3 with at least 1 for each of steatosis, inflammation and ballooning)?  If requested by the FDA, why go up to the maximum 20% of study population (placebo was 26%)?  **In our view, this feature of the study**

***needlessly introduces confounding risk, and may have played a part in missing the primary endpoint, in our view***.

(Emphasis in original and added.)

64.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of Akero stock, plaintiff and other Class members (defined below) have suffered significant losses and damages for which they seek redress through this action.

### ADDITIONAL SCIENTER ALLEGATIONS

65.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of Akero, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Akero and its clinical trials of EFX, and their control over and/or receipt and/or modification of Akero's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

66.     Defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of Akero, including the Individual Defendants.

67.     The Individual Defendants, because of their positions with Akero, controlled the contents of Akero's public statements during the Class Period and were intimately involved in Akero's clinical trials of EFX.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were

1  being concealed from the public and that the positive representations that were being made were

2  false and misleading.

3        68.    A number of additional facts support plaintiff's allegations that defendants had

4  fraudulently concealed Akero's inclusion of cryptogenic cirrhotics in the SYMMETRY study long

5  before the truth was revealed.

6        69.    First, defendants had ample financial motive to conceal the truth.  Akero had suffered

7  recurring losses since its inception and needed to raise significant capital to fund its clinical trials

8  program and the commercialization of EFX.  During the Class Period Akero conducted two

9  secondary offerings of common stock, raising gross proceeds of $230 million in a September 2022

10  offering of more than 8.8 million shares at $26 per share (including the underwriters' full exercise of

11  their option to purchase additional shares), and raising gross proceeds of $220 million in a May 2023

12  offering of more than 5.2 million shares at $42 per share.  During the Class Period, Akero raised an

13  additional $127 million in an ATM offering of common stock in March and April 2023 by selling

14  over 3 million Akero shares at an average price of $42.38 per share.  In the aggregate, Akero raised

15  at least $577 million in gross offering proceeds from these 3 offerings over a 13-month period.  By

16  concealing the inclusion of cryptogenic cirrhotics when discussing the SYMMETRY study,

17  defendants made it easier for Akero to raise the funding it desperately needed.

18        70.    Second, every clinical trial must be conducted according to a clinical trial protocol,

19  which is "[a] document that describes the objective(s), design, methodology, statistical

20  considerations, and organization of a trial.  The protocol usually also gives the background and

21  rationale for the trial, but these could be provided in other protocol referenced documents." *E6 (R2)*

22  *Good Clinical Practice: Integrated Addendum to ICH E6(R1), Guidance for Industry* §1.44 (FDA

23  Mar. 2018).  The sponsor of the clinical trial, here Akero, is responsible for designing the protocol.

24  *Id.*, §5.4.1.  The trial's protocol is to include, *inter alia*, patient inclusion and exclusion criteria, a

25  specific statement of the endpoints to be measured during the trial, and a description of the statistical

26  methods to be employed.  *Id.*, §§6.5.1-6.5.2, 6.4, 6.9.1.  After the sponsor designs the protocol, the

27  sponsor ultimately provides it to the trial's investigators who agree to be bound by its terms when

28  testing patients.  Specifically, "[t]he investigator/institution should conduct the trial in compliance

1   with the protocol agreed to by the sponsor and, if required, by the regulatory authority(ies), and

2   which was given approval/favorable opinion by the IRB/IEC.  The investigator/institution and the

3   sponsor should sign the protocol, or an alternative contract, to confirm agreement." *Id.*, §4.5.1.  The

4   Individual Defendants personally oversaw this process.  For example, defendant Yale signed the

5   protocol governing Akero's Phase 2 BALANCED study, which included a representation directly

6   above her signature that "[t]his clinical study protocol was subject to critical review and has been

7   approved by the Sponsor."

8          71.    Based on Akero's creation of the trial protocol, the Individual Defendants'

9   participation with and access thereto, the fact that defendants have admitted discussing the

10  cryptogenic patient population included in the study with the FDA, and the obvious importance of

11  the protocol to the SYMMETRY study, defendants knew or recklessly disregarded the relevant facts

12  and risks connected to the inclusion of cryptogenic cirrhotics in the SYMMETRY trial.

13  Furthermore, during the October 10, 2023 Call, defendant Yale admitted that the exclusion of

14  cryptogenic cirrhotics from the secondary endpoint calculations was "prespecified," thereby

15  conceding that the trial's protocol permitted the inclusion of cryptogenic cirrhotics in the trial as well

16  as their exclusion from certain of the secondary endpoint calculations.  Defendants have also

17  admitted that they discussed the inclusion of cryptogenic cirrhotics in the study with the FDA,

18  confirming their knowledge of this patient subset.  Furthermore, the protocol's recognition of the

19  need for separate data sets (via the exclusion of cryptogenic cirrhotics from certain secondary

20  endpoint calculations) itself made clear to defendants that the inclusion of cryptogenic cirrhotics was

21  material information, the omission of which when describing the study was likely to deceive

22  investors.

23         72.    Third, as alleged above, defendants repeatedly made statements about the

24  SYMMETRY trial and the patient population EFX was being tested on.  These repeated statements

25  demonstrated defendants' familiarity with the study and its patients.

26         73.    Fourth, given Akero's responsibilities for the trial protocol and the significance of the

27  SYMMETRY study to Akero's business and prospects, the study's inclusion and exclusion criteria

28  and basic features of the study's endpoint calculations were part of the Company's core operations.

1   As such, a strong inference can be drawn that, based on their positions at the Company, the

2   Individual Defendants, and therefore Akero, were well aware of the true facts concerning the study's

3   inclusion of cryptogenic cirrhotics and the study's endpoint calculations, or at the very least that

4   defendants recklessly disregarded this information when making their Class Period statements to

5   investors.

**NO SAFE HARBOR**

7   74.   Defendants' "Safe Harbor" warnings accompanying their reportedly forward-looking

8   statements ("FLS") issued during the Class Period were ineffective to shield those statements from

9   liability.  To the extent that projected revenues and earnings were included in Akero's financial

10  reports prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), including

11  those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe

12  Harbor.  15 U.S.C. §78u-5(b)(2)(A).

13  75.   Defendants are also liable for any false or misleading FLS pled because, at the time

14  each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized

15  and approved by an executive officer of Akero who knew that the FLS was false.  None of the

16  historic or present tense statements made by defendants were assumptions underlying or relating to

17  any plan, projection, or statement of future economic performance, as they were not stated to be such

18  assumptions underlying or relating to any projection or statement of future economic performance

19  when made, nor were any of the projections or forecasts made by defendants expressly related to or

20  stated to be dependent on those historic or present tense statements when made.

**APPLICATION OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

76.   At all relevant times, the market for Akero common stock was an efficient market for

the following reasons, among others:

(a)   Akero common stock met the requirements for listing, and was listed and

actively traded on the NASDAQ, a highly efficient and automated market;

(b)   according to Akero's Form 10-K for the fiscal year ended December 31, 2022,

Akero had more than 46 million shares outstanding as of March 14, 2023;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                           - 21 -

1          (c)     as a regulated issuer, Akero filed periodic public reports with the SEC;

2          (d)     Akero regularly communicated with public investors via established market

3     communication mechanisms, including the regular dissemination of press releases on national

4     circuits of major newswire services, the internet, and other wide-ranging public disclosures; and

5          (e)     unexpected material news about Akero was rapidly reflected in and

6     incorporated into the price for Akero stock during the Class Period.

7          77.     As a result of the foregoing, the market for Akero stock promptly digested current

8     information regarding Akero from publicly available sources and reflected such information in the

9     price of Akero stock.  Under these circumstances, all purchasers of Akero stock during the Class

10    Period suffered similar injury through their purchases of Akero stock at artificially inflated prices,

11    and a presumption of reliance applies.

12         78.     A presumption of reliance is also appropriate in this action under the Supreme Court's

13    holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims

14    are based, in significant part, on defendants' material omissions.  Because this action involves

15    defendants' failure to disclose material adverse information regarding Akero's business, operations,

16    and guidance, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that

17    the facts withheld be material in the sense that a reasonable investor might have considered them

18    important in making investment decisions.   Given the importance of defendants' material

19    misstatements and omissions set forth above, that requirement is satisfied here.

20                              **LOSS CAUSATION/ECONOMIC LOSS**

21         79.     During the Class Period, as detailed herein, defendants made false and misleading

22    statements and engaged in a scheme to deceive the market and a course of conduct that artificially

23    inflated the price of Akero stock and operated as a fraud or deceit on Class Period purchasers of

24    Akero stock by misrepresenting the value of Akero's business and prospects by concealing Akero's

25    inclusion of patients with cryptogenic cirrhosis in the Company's SYMMETRY trial and its various

26    ramifications.  As defendants' misrepresentations and fraudulent conduct became apparent to the

27    market, the price of Akero stock fell precipitously as the prior artificial inflation came out of the

28    stock's price and the concealed risks transpired.  As a result of their purchases of Akero stock during

1   the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages,

2   under the federal securities laws.

3                           **CLASS ACTION ALLEGATIONS**

4        80.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

5   Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Akero common stock

6   during the Class Period (the "Class").  Excluded from the Class are defendants, the officers and

7   directors of Akero, at all relevant times, members of their immediate families, and their legal

8   representatives, heirs, successors, or assigns, and any entity in which defendants have or had a

9   controlling interest.

10       81.     The members of the Class are so numerous that joinder of all members is

11  impracticable.  Throughout the Class Period, Akero stock was actively traded on the NASDAQ.

12  While the exact number of Class members is unknown to plaintiff at this time and can only be

13  ascertained through appropriate discovery, plaintiff believes that there could be hundreds or

14  thousands of members in the proposed Class.  Record owners and other members of the Class may

15  be identified from records maintained by Akero or its transfer agent and may be notified of the

16

17  pendency of this action by mail, using the form of notice similar to that customarily used in

18  securities class actions.

19       82.     Plaintiff's claims are typical of the claims of the members of the Class as all members

20  of the Class are similarly affected by defendants' wrongful statements and conduct in violation of

21  federal law that is complained of herein.

22       83.     Plaintiff will fairly and adequately protect the interests of the members of the Class

23  and has retained counsel competent and experienced in class and securities litigation.

24       84.     Common questions of law and fact exist as to all members of the Class and

25  predominate over any questions solely affecting individual members of the Class.  Among the

26  questions of law and fact common to the Class are:

27            (a)     whether defendants violated the Exchange Act as alleged herein;

28

(b)      whether statements made by defendants misrepresented or omitted material facts about the business, operations, and prospects of Akero, EFX, and the SYMMETRY trial;

(c)      whether defendants acted with scienter; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

85.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5**
**Against All Defendants**

86.      Plaintiff incorporates ¶¶1-85 by reference.

87.      During the Class Period, defendants disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.      Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)      employed devices, schemes, and artifices to defraud;

(b)      made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Akero stock during the Class Period.

89.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Akero stock.  Plaintiff and the Class would not

have purchased Akero stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' false and misleading statements and fraudulent scheme.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

90.     Plaintiff incorporates ¶¶1-89 by reference.

91.     Defendants acted as controlling persons of Akero within the meaning of §20(a) of the Exchange Act.  By reason of their positions with Akero and/or ownership of Akero stock, the Individual Defendants had the power and authority to cause Akero to engage in the wrongful conduct complained of herein.  Akero controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable, injunctive, or other relief as deemed appropriate by the Court.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  April 26, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS

s/ Shawn A. Williams
SHAWN A. WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
RICHARD W. GONNELLO
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100

ABRAHAM, FRUCHTER & TWERSKY, LLP
JACK G. FRUCHTER
450 Seventh Avenue, 38th Floor
New York, NY  10123
Telephone:  212/279-5050
212/279-3655 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Dora Klobus, certify under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1.      I have reviewed a Complaint for Violations of Federal Securities Laws against Akero Therapeutics, Inc. ("Akero") and authorize the filing of a comparable complaint on my behalf.

2.      I did not purchase any security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      All of my transactions in Akero common stock are set forth in Exhibit A attached hereto.

5.      I have not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to this date.

6.      I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of April, 2024.

_____
                                Dora Klobus

AKRO

**<u>EXHIBIT A</u>**

| Joseph Klobus - Designated Bene Individual ...232 | | | | |
|---|---|---|---|---|
| **Transaction** | **Trade Date** | **Shares Transacted** | **Price** | **Amount** |
| Class Start | 09/13/2022 | | | |
| Buy | 10/02/2023 | 100 | $50.9746 | ($5,097.46) |
| Class End | 10/09/2023 | | | |

AKRO